NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN WRONKO and COLLENE WRONKO, Husband and Wife, | |
| Plaintiffs, | Civ. No. 16-2288 |
| v. | **OPINION** |
| NANCY MARTIN, et al., | |
| Defendants. | |

THOMPSON, U.S.D.J.

## **INTRODUCTION**

This matter comes before the Court upon four Motions for Summary Judgment: one filed by Plaintiffs Steven Wronko and Collene Wronko (collectively, "Plaintiffs") (ECF No. 96);[1] one filed by Defendants Michal Cielesz and Richard Cielesz (collectively, "Cielesz Defendants") (ECF No. 93); one filed by Defendants Borough of Helmetta ("Borough"), Helmetta Police Department ("Police Department"), Helmetta Regional Animal Shelter ("Animal Shelter" or the "Shelter"), Robert Manney, Michael Baltazar, Devon Gannon, Chad Lockman, Richard Recine, and Gene Scheicher (collectively, "Borough Defendants") (ECF No. 94); and one filed by Defendant Nancy Martin (ECF No. 95). The Court has decided this matter on the written submissions of the parties, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Plaintiffs' Motion is denied, Cielesz Defendants' Motion is granted, Borough Defendants' Motion is granted in part and denied in part, and Defendant Martin's Motion is granted in part and denied in part.

---

[1] Plaintiffs move only for partial summary judgment. (Mot. at 1.)

# **BACKGROUND**

This case arises from activities surrounding Plaintiffs' protest of alleged mistreatment of animals at Defendant Animal Shelter. (*See generally* Compl., ECF No. 1-2.) Plaintiffs claim that Defendants attempted to prohibit them from documenting abuse and neglect at the Shelter and retaliated against them for doing so. (*Id.*) Defendant Police Department and Defendant Animal Shelter were departments of Defendant Borough. (*Id.* ¶ 4; Borough Defs.' Stmt. of Undisputed Material Facts ("SOUMF") ¶¶ 5, 9, ECF No. 94-2.) Defendant Martin was the Mayor of Defendant Borough. (Compl. ¶ 2.) Defendant Michal Cielesz was Director of Defendant Animal Shelter, and Defendant Richard Cielesz was Assistant Director. (*Id.* ¶¶ 18–19.) Defendant Manney was the Police Director of Defendant Police Department. (Borough Defs.' SOUMF ¶ 6.) Defendants Baltazar, Gannon, Lockman, Recine, and Scheicher were police officers at Defendant Police Department. (*Id.* ¶ 7.)

Plaintiffs became motivated to protest at Defendant Animal Shelter because they adopted a dog that soon required medical treatment. (*Id.* ¶¶ 13–15.) On August 1, 2014, Plaintiff Steven Wronko entered the Shelter, claimed he worked for the press, and demanded to see the Shelter's fire inspection report. (*Id.* ¶ 16.) He was videotaping at this time. (*Id.*) Defendant Cielesz told Plaintiff Steven Wronko that the fire inspection report was not presently available. (*Id.* ¶ 17.) The parties dispute whether Plaintiff Steven Wronko became disorderly at this point. (*Compare id.*, *with* Pls.' Resp. to Borough Defs.' SOUMF ¶ 17, ECF No. 97-1.) Defendant Scheicher then arrived at the scene. (Borough Defs.' SOUMF ¶ 18.) Plaintiff Steven Wronko was allowed to access the public areas of the Shelter but was told he needed to make arrangements to enter any non-public areas. (*Id.* ¶ 20.) Defendant Scheicher later returned to the Shelter because, according to his own testimony, "employees at the Shelter were now becoming alarmed for their safety."

(*Id.* ¶ 21.) Defendant Scheicher, along with Defendant Baltazar, instructed Plaintiff Steven Wronko to leave for what was described as a twenty-four-hour cooling-off period. (*Id.* ¶¶ 22–23.)[2]

The next day, on August 2, 2014, Plaintiff Steven Wronko took pictures outside the Shelter. (*Id.* ¶ 27.) He was allowed to photograph outside (*id.* ¶ 28), but the parties disagree as to whether a non-party police officer prevented him from coming inside (*compare id.* ¶ 27, *with* Pls.' Resp. to Borough Defs.' SOUMF ¶ 27).

On August 4, 2014, Plaintiff Steven Wronko entered the municipal building, which housed Defendant Police Department, the municipal court, and municipal offices. (Borough Defs.' SOUMF ¶ 29.) He was then confronted by Defendant Lockaman, who asked him why he was in the building. (*Id.* ¶ 32.) Plaintiff Steven Wronko stated that he had a right to videotape in the building and handed Defendant Lockman related "case law." (*Id.*) Defendant Lockman then left to speak to Defendant Manney. (*Id.*) While Defendant Lockman was gone, Defendant Recine arrived and asked Plaintiff Steven Wronko who he was; Plaintiff Steven Wronko refused to answer. (*Id.* ¶ 33.) Defendant Recine later said that "Obama has decimated the frickin' Constitution. . . . If he doesn't follow the Constitution, we don't have to." (Opp'n to Mot. for Sanctions, Ex. D 2:15–25, ECF No. 77-5.) Then, Defendant Lockman returned with Director Manney. (Borough Defs.' SOUMF ¶ 36.) Plaintiff Steven Wronko told Defendant Manney that he was "conducting an investigation about the shelter," but stated that he did not have a subpoena. (*Id.* ¶ 36.) Defendants Manney and Lockman then escorted Plaintiff Steven Wronko

---

[2] According to Borough Defendants, Defendant Scheicher told Plaintiff Steven Wronko that Defendant Michal Cielesz, Defendant Manney, Defendant Martin, or some combination of these individuals had directed the officers to remove him from the Shelter. (Borough Defs.' SOUMF ¶ 24.) Plaintiffs deny this. (Pls.' Resp. to Borough Defs.' SOUMF ¶ 24.)

out of the building. (*Id.* ¶ 39.) Whether Defendant Recine participated in escorting him out is disputed. (*Compare id.* ¶ 44 ("[Defendant] Recine did not participate . . ."), *with* Pls.' Resp. to Borough Defs.' SOUMF ¶ 44 ("[Defendant] Recine was there and didn't object to it, so, I mean, it was kind of the three of them walking [Plaintiff Steven Wronko] out the door.").)

Plaintiff Steven Wronko testified that on another occasion he was at the Shelter to look at dogs, and Defendant Scheicher instructed him to leave because employees there felt intimidated. (Steven Wronko Dep. 180:15–182:9, ECF No. 94-6.) In general, Plaintiff Steven Wronko testified that he was allowed to videotape at the shelter at certain times and not at other times. (Borough Defs.' SOUMF ¶ 53.) Plaintiff Steven Wronko was never denied access to the Shelter at times when he was not videotaping. (*Id.* ¶ 50.)

Plaintiff Steven Wronko testified that Defendant Police Department put up caution tape outside the Shelter, affecting where he and other protesters could park and protest. (Steven Wronko Dep. 147:13–148:1.) According to Plaintiff Collene Wronko, on one occasion she was at a protest and was prevented from entering the Shelter by a Councilman and police officer, both of whom are not parties. (Borough Defs.' SOUMF ¶ 55.) She also testified that on another occasion she and other protestors sought to bring food inside the Shelter, and Defendant Baltazar told her in particular she could not enter because she was a "troublemaker." (*Id.* ¶ 56.)

Plaintiff Collene Wronko also testified that she once attempted to enter the Shelter during a public event. (Collene Wronko Dep. 188:11–17, ECF No. 94-7.) Defendant Martin asked for Plaintiff Collene Wronko's driver's license, and Plaintiff Collene Wronko refused to provide it because she believed Defendant Martin had a list of names of people to exclude from the event. (*Id.* 188:20–24.) Defendant Martin then told Plaintiff Collene Wronko to leave. (*Id.* 189:3–4.) Plaintiff Collene Wronko also testified that Defendant Martin called her a "troublemaker"

because she refused to produce her driver's license. (*Id.* 188:17–20.)

Plaintiff Collene Wronko testified that in September 2014 she attempted to enter the municipal building to drop off a document to a Councilwoman, but Defendant Baltazar told her to leave. (Borough Defs.' SOUMF ¶ 68.) She also testified that sometime in late August 2015, she went to the municipal building to pick something up from the Municipal Court Clerk. (*Id.* ¶ 67.) Defendant Lockman asked why she was there, she did not tell him what she sought to pick up, and he did not allow her to enter. (*Id.*)

Both Plaintiffs testified that Defendants Baltazar, Gannon, and Lockman approached them about using vulgar language. (*Id.* ¶¶ 71–72.) Plaintiff Steven Wronko testified that Defendants Baltazar and Gannon threatened him with arrest if he did not stop cursing, though he was never actually arrested. (*Id.* ¶ 71.)

Defendant Scheicher testified that, on August 14, 2014, he and Defendant Gannon were dispatched to a wooded area behind the Shelter in response to a report of two suspicious people coming in and out of the woods. (*Id.* ¶ 74.) They found Plaintiff Collene Wronko, who appeared to be hiding. (*Id.*) Defendant Scheicher claims that he advised Plaintiff Collene Wronko that she was trespassing and requested her credentials, which she refused to provide. (*Id.* ¶ 75.) Defendant Scheicher claims that he told Plaintiff Collene Wronko that she was not under arrest and states that she left the property. (*Id.* ¶ 76.) According to Plaintiff Collene Wronko, she was on public property and was illegally detained for twenty minutes. (Pls.' Resp. to Borough Defs.' SOUMF ¶ 77.)

According to Defendant Baltazar, on August 25, 2014 Plaintiff Collene Wronko was in a parked car on the side of the road on private property where there had been a burglary the night before. (Borough Defs.' SOUMF ¶ 78.) Plaintiff Steven Wronko was across the street

videotaping. (*Id.* ¶ 79.) Defendants Baltazar and Scheicher told Plaintiffs that they were trespassing, Plaintiffs argued with them and refused to produce identification, and Plaintiffs eventually left of their own accord. (*Id.* ¶¶ 80–81.) According to Defendant Baltazar, Plaintiff Steven Wronko was later issued a summons for trespassing. (*Id.*)

On November 23, 2014, Defendant Baltazar arrested Plaintiff Steven Wronko and charged him with obstructing administration of law or other government function, N.J.S.A. § 2C:29-1(a); resisting arrest, N.J.S.A. § 2C:29-2(a); and simple assault, N.J.S.A. § 2C:12-1(a)(1). (Pls.' SOUMF ¶ 33, ECF No. 96-1.) Borough Defendants allege that Plaintiff Steven Wronko defied Defendant Baltazar's order to stay back from officers who were arresting Plaintiff Collene Wronko, and that he made it difficult to handcuff him when he was arrested. (Borough Defs.' SOUMF ¶ 88.) Plaintiffs deny this, state that Plaintiff Steven Wronko was found not guilty, and argue that video evidence makes clear that Plaintiff did not obstruct justice. (Pls.' Resp. to Borough Defs.' SOUMF ¶ 88; Pls.' SOUMF ¶¶ 34–36.)[3]

The Attorney for Defendant Borough drafted a proposed ordinance that would have regulated photography in various municipal buildings. (Def. Martin's SOUMF ¶¶ 18–19, ECF No. 95-2.) The ordinance never became law. (*Id.* ¶ 19.) Defendant Martin also identified Plaintiffs in material for her reelection campaign and stated that Plaintiffs cost taxpayers money due to litigation. (*Id.* ¶ 20; *see also* Compl. Exs. C–E.)

On August 1, 2014, Borough Administrator Herbert Massa (who is not a party to this case) sent an email to Defendants Martin, Manney, Michal Cielesz, Lockman, and others,

---

[3] Borough Defendants describe another incident in which Plaintiffs were allegedly wrongfully arrested. (See Borough Defs.' SOUMF ¶¶ 83–85.) However, Plaintiffs deny that the arrest happened (Pls.' Resp. to Borough Defs.' SOUMF ¶ 85), and in any case the Complaint does not bring a wrongful arrest claim.

stating, "No one is able to photograph, record or film activities within the Animal Shelter unless authorized by the Mayor, Council President, Borough Administrator, Animal Shelter Director or by Court Order." (Pls.' SOUMF ¶ 2; Pls. Ex. B, ECF No. 96-5.) The email also stated, "Persons attempting to enter the Animal Shelter to photograph, record or film inside the shelter are to be asked to stop and Helmetta Police are to be called. The Helmetta Police will escort these individuals off the property." (*Id.*) Defendant Martin also sent an email to Administrator Massa, Defendants Michal Cielesz and Manney, and others. (Pls.' SOUMF ¶ 1.) This email stated:

> In 2011 I worked for the construction department. I recall that no one is authorized to take photos in public buildings. [Defendant] Scheicher continued to disagree with us. [Plaintiff Steven] Wronko indicated he was the press but did not have to produce any proof. . . . Over and over again Yvette indicated she did not want to be recorded or photographed and said she better not see herself on any face book page. She is clearly now posted on the face book page. In addition [Defendant Scheicher] arrived back and he indicated he would ask him to be removed but he was authorized to walk around our property and take [pictures] of anything and everything. Really—an employee?? Josh was being filmed, all our AGO vehicles were photographed, the dumpier [*sic*], our building, etc., etc. I personally could care less [if] they bash me on this face book page because we know the truth but when they bash "the Borough" I have a big issue with this. I am asking (since we know this will continue for awhile) that all officers are made aware of this ugly situation and the need for our employees to be safe. I was told that we could contact the prosecutor's office to see if this site can be taken down? Can this be looked into? There is a [picture] of Joey at the vet's office—are the AGO being followed?

(*Id.*) Defendant Manney testified that he sent Administrator Massa's email to police officers but that he also instructed "that they are not to violate anyone's rights," and that "people have a right to film in public." (Borough Defs.' Resp. to Pls.' SOUMF ¶ 6, ECF No. 100-1; Borough Defs.' SOUMF ¶¶ 61–62.) He also testified that he spoke to Administrator Massa about the email, saying that police officers would obey the law and that he understood that "people could photograph in public areas." (*Id.*) Defendant Manney did not believe that the emails were enforced or implemented as the policy of Defendant Police Department. (Borough Defs.' Resp. to Pls.' SOUMF ¶¶ 7–8.)

Defendant Recine did not receive any training on constitutional law from Defendant Police Department (Pls.' SOUMF ¶ 12), but he previously worked for other police departments where he received such training (Borough Defs.' Resp. to Pls.' SOUMF ¶ 12.).

The Complaint alleges the following Counts against all Defendants: (I) violation of free speech rights under the First and Fourteenth Amendments of the U.S. Constitution, Article I § 6 of the New Jersey Constitution, and the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. § 10:6-1 *et seq.*[4] (Compl. ¶¶ 80–81); (II) violation of rights "to freely . . . assemble together to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances" under the First and Fourteenth Amendments of the U.S. Constitution, Article I § 18 of the New Jersey Constitution, and NJCRA (*id.* ¶¶ 82–83); (III) violation of due process under the Fifth and Fourteenth Amendments of the U.S. Constitution, the New Jersey Constitution,[5] and NJCRA (*id.* ¶¶ 84–85); and (IV) violation of NJCRA (*id.* ¶¶ 86–88). Additionally, the following Counts are brought against particular Defendants: (V) failure to train, supervise, or discipline in violation of NJCRA and Article I of the New Jersey Constitution against Defendants Borough, Police Department, Manney, and Martin (*id.* ¶¶ 89–97); (VI) unconstitutional policymaking against Defendants Manney and Martin (*id.* ¶¶ 98–102); (VII) invasion of privacy/false light against Defendant Martin (*id.* ¶¶ 103–105); and (VIII) civil conspiracy to violate civil rights in violation of the First and Fourteenth Amendments of the U.S. Constitution, Article I § 18 of the New Jersey Constitution, and NJCRA against Defendants

---

[4] The Complaint repeatedly refers to N.J.S.A. § 10:5-1 *et seq.* (*e.g.*, Compl. at 17), which is the New Jersey Law Against Discrimination. Based on the nature of Plaintiffs' claims, the Court interprets all such references to refer to NJCRA, N.J.S.A. § 10:6-1 *et seq.*

[5] The Complaint cites Article I § 7 of the New Jersey Constitution, but due process rights are actually housed under Article I § 1. *State v. Feaster*, 877 A.2d 229, 238 n.3 (N.J. 2005).

Police Department, Manney, and Martin (*id.* ¶¶ 106–08).[6]

Plaintiffs (ECF No. 96), Cielesz Defendants (ECF No. 93), Borough Defendants (ECF No. 94), and Defendant Martin (ECF No. 95) filed separate Motions for Summary Judgment on January 25, 2019. Plaintiffs opposed each of Defendants' Motions on February 6 and 8, 2019. (ECF Nos. 97–99.) On February 8, 2019, each group of Defendants opposed Plaintiffs' Motion. (ECF Nos. 100–02.) On February 19, 2019, Plaintiffs (ECF Nos. 103–05) and each group of Defendants (ECF Nos. 106–08) replied.[7] The Motions are presently before the Court.

## LEGAL STANDARDS

### I.      Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Consequently, "[s]ummary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." *Josey v.*

---

[6] The Complaint also alleges claims against Defendants Brandon Metz, Michael Metz, New Jersey Humane Police, N.J.S.P.C.A., and Frank Rizzo. These parties, as far as the Court can discern, have not participated in this case. The Court will ignore these Defendants for purposes of the present Motions.

[7] All of Plaintiffs' Opposition briefs and one of its Reply briefs were longer than permitted. (*See* Letter Order, ECF No. 88 ("A brief accompanying any dispositive motion or opposition thereto may not exceed 20 pages. A reply brief may not exceed 10 pages.").) The Court therefore did not consider material presented past the twentieth page of each brief.

*John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Anderson*, 477 U.S. at 248).

In resolving a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits." *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II.    Liability for Federal and State Constitutional Violations

42 U.S.C. §1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Individual defendants in a § 1983 case, however, are protected by the doctrine of qualified immunity. "[Q]ualified immunity shields government officials [engaged in discretionary functions] from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court must determine whether the right violated was clearly established such that "every reasonable official would have understood that what he [was] doing violates that right."

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Clearly established law may not be defined "at a high level of generality." *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)). While a factually identical precedent is not required, the law must be clear enough to give the official "'fair warning' that his conduct was unconstitutional.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002)). Municipalities are not entitled to qualified immunity. *Owen v. City of Indep.*, 445 U.S. 622, 650–51 (1980).

To hold a municipality liable, a plaintiff must show that there was a policy or custom causing the constitutional deprivation. *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). A municipality is liable for "acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). Alternatively, where a claim is based on a failure to train or to supervise, a plaintiff must demonstrate both "deliberate indifference to the rights of persons with whom those employees will come into contact," *Thomas*, 749 F.3d at 222 (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)) (internal quotations omitted), and a "causal nexus" between the failure to train and the constitutional injury, *id.* at 222, 226–27 (citing *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). A finding of deliberate indifference requires that the constitutional violation be a "highly predictable consequence" of the failure to train, *id.* at 225 (citing *Connick v. Thompson*, 563 U.S. 51, 64 (2011)), which arises where a pattern of similar violations has occurred in the past, *id.* at 223 (citing *Connick*, 563 U.S. at 62), or where the need for training is "obvious," *id.* (providing the example that the need to train officers on the use of deadly force is obvious (citing *Canton*, 489 U.S. at 390 n.10)). An individual may be held

liable as a policymaker in the same manner as a municipality. *A.M.* ex rel. *J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).[8]

## DISCUSSION

I.      **Summary Judgment is Granted for Defendants Police Department and Animal Shelter**

The law is clear, and the parties agree, that Defendants Police Department and Animal Shelter are merely administrative arms of Defendant Borough. (*See* Borough Defs.' Br. at 4–5, ECF No. 94-1; Pls.' Opp'n Br. at 11–13, ECF No. 97.) As such, summary judgment should be granted for these two Defendants, and claims brought against them are imputed to Defendant Borough. *See Woodyard v. Cty. of Essex*, 514 F. App'x 177, 181 (3d Cir. 2013); *Adams v. City of Camden*, 461 F. Supp. 2d 263, 266 (D.N.J. 2006).

II.     **Counts I (Free Speech) and II (Free Assembly and Petition): Summary Judgment is Granted for Defendants Michal Cielesz, Richard Cielesz, and Scheicher**

A.      *Restrictions on the Right to Record*

This case concerns a long list of interactions between Plaintiffs and various Defendants that could potentially implicate rights to free speech, assembly, and petition under the federal and state constitutions.[9] Interpreting the facts in the light most favorable to Plaintiffs, Defendants

---

[8] Additionally, the NJCRA provides that, "Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, [or interference] by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief." N.J.S.A. § 10:6-2(c). This statute is the New Jersey state counterpart to § 1983 and operates "nearly identical[ly]." *Chapman v. New Jersey*, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009). In particular, the qualified immunity analysis is the same under the federal and state statutes. *Morillo v. Torres*, 117 A.3d 1206, 1213 (N.J. 2015). The Court will therefore discuss this case only under the § 1983 standard.

[9] Article I, Sections 6 and 18 of the New Jersey Constitution apply to some private entities as well as public entities, but they are otherwise largely coextensive with their federal counterparts. *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 168 n.7 (3d Cir. 2008) (citing *State,*

Manney, Baltazar, Lockman, Recine, and Scheicher prevented Plaintiff Steven Wronko from

entering public places on several occasions because he was attempting to record matters of

public import in a public place. (*See* Borough Defs.' SOUMF ¶¶ 13–24, 27–44.) In 2017, the

Third Circuit announced a federal constitutional right to record public officials—or at least

police officers—conducting their public duties in public areas. *Fields v. City of Phila.*, 862 F.3d

353, 358–60 (3d Cir. 2017). But because most of the relevant action in this case occurred in

2014, this right was not clearly established at the relevant time. *Id.* at 362. Nevertheless, the New

Jersey state constitution confers a right to record for the purposes of making a documentary, and

this right has been clearly established since at least 2006. *Ramos v. Flowers*, 56 A.3d 869, 881

(N.J. Super. Ct. App. Div. 2012) ("[A] reasonable police officer in 2006 could not have believed

he had the absolute right to preclude [plaintiff] from videotaping any gang activities or any

interaction of the police with gang members for the purposes of making a documentary film on

that topic."). Therefore, a reasonable jury could find facts showing that Defendants Baltazar,

Lockman, Manney, Recine, and Scheicher violated Plaintiff Steven Wronko's clearly established

right, so summary judgment must be denied for these Defendants. At the same time, a citizen's

right to record is "subject to reasonable time, place, and manner restrictions. *Id.* (internal

quotation omitted). A reasonable jury could find facts showing that the limits placed on Plaintiff

Steven Wronko's recording were simply the result of reasonable restrictions,[10] so summary

---

*Twp. of Pennsauken v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999)); *State v. Schmid*, 423 A.2d 615, 626–28 (N.J. 1980); *see also* Robert F. Williams, The New Jersey State Constitution 65, 79 (2d ed. 2012) ("Generally speaking, . . . free speech matters have been analyzed under federal constitutional principles.").

[10] This question will largely depend upon the reasons for Defendants' behavior. The record on summary judgment is not clear about whether Defendants prevented Plaintiff from recording because of the views he expressed or because of concerns for public safety or other legitimate reasons.

judgment must be denied for Plaintiffs as well.

B.    *First Amendment Retaliation*

Taking the facts in the light most favorable to Plaintiffs, Defendants retaliated against them for exercising their speech, assembly, and petition rights by barring them from entering public buildings (*e.g.*, Borough Defs.' SOUMF ¶ 56), publishing negative campaign material concerning them (*id.* ¶ 20), and arresting them (*id.* ¶ 88; Pls.' SOUMF ¶¶ 33–36). The case law on First Amendment retaliation has not been fully elucidated. *Thomas v. Indep. Twp.*, 463 F.3d 285, 290, 296 n.4 (3d Cir. 2006) (noting the "dearth of precedent of sufficient specificity regarding an individual's First Amendment right to be free from retaliatory harassment" (quoting *McKee v. Hart*, 436 F.3d 165, 173 (3d Cir. 2006)) (internal brackets and elipses omitted)). It is clearly established that police engage in unconstitutional retaliation when, in response to the exercise of Free Speech and Petition rights, they launch a campaign of harassment and intimidation that includes increased police presence and surveillance and wrongful accusations of violating the law. *Id.* at 296. But it is not clearly established whether police engage in unconstitutional retaliation by making an arrest supported by probable cause. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018); *Reichle v. Howards*, 566 U.S. 658, 668 (2012). And it is clearly established that retaliatory defamation by a public official, in and of itself, does not violate the First Amendment. *Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 825 (3d Cir. 2009) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (3d Cir. 2000)). Defendants' possibly retaliatory actions in barring Plaintiffs from public buildings and publishing campaign material are different from those described in *Thomas*, 463 F.3d at 290,[11]

---

[11] In *Thomas*, defendant-police officers allegedly "(1) "enter[ed] the [p]laintiffs' business without probable cause or valid reason; (2) wrongly accus[ed] the [p]laintiff . . . of violating the

so summary judgment for individual Defendants is appropriate on these actions. Whether

Defendant Baltazar is entitled to qualified immunity with regard to his arrest and charge of

Plaintiff Steven Wronko depends on whether that arrest was supported by probable cause,

*Lozman*, 138 S. Ct. at 1954; *Reichle*, 566 U.S. at 668, and there is a factual dispute as to the facts

surrounding the existence of probable cause. For this reason, summary judgment may not be

granted for Defendant Baltazar on this matter.

      C.    *Other Incidents*

      For other incidents that occurred in this case, Plaintiffs either lacked a constitutional right

to the activity they claim Defendants infringed, or such a constitutional right was not clearly

established at the time. In some instances, Plaintiffs were barred from access to the Shelter and

the municipal building while they were protesting (Borough Defs.' SOUMF ¶¶ 55–56; Steven

Wronko Dep. 147:13–148:1) or conducting other activities (Borough Defs.' SOUMF ¶¶ 53

(looking at dogs at the Shelter), 67–68 (dropping off and picking up documents), 74–76 (hiding

in wooded area); Collene Wronko Dep. 188:11–189:4 (attending a public event)). There is no

clearly established right to inhabit an animal shelter or municipal building for these purposes,

particularly given the government's power to reserve nonpublic forums "for [their] intended

purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not

an effort to suppress expression merely because public officials oppose the speaker's view."

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (citing *U.S. Postal

Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981)). Individual Defendants are therefore

---

law; (3) misrepresent[ed] the laws; (4) conduct[ed] surveillance of Plaintiffs, their businesses, and patrons from an area located across the street from Plaintiffs' business; (5) increase[ed] and heighten[ed] police presence and surveillance; (6) subject[ed] the Plaintiffs to unreasonable and unlawful search and seizure; and (7) threaten[ed] and/or caus[ed] unwarranted investigations of the Plaintiffs by other governmental agencies." 463 F.3d at 290 (internal quotations omitted).

entitled to qualified immunity with regard to these incidents.

Separately, Plaintiff Collene Wronko was not allowed to drop off a document to a councilwoman. (Borough Defs.' SOUMF ¶ 68.) While it is unconstitutional to disallow a citizen's contact with municipal officials, *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017), this doctrine was not clearly established before 2017, *id.* at 652–53. Qualified immunity is therefore appropriate as to this incident.

Defendants Baltazar, Gannon, and Lockman told Plaintiffs not to use foul language. (Borough Defs.' SOUMF ¶¶ 71–72.) Simply being told by a government official not to use foul language is not a First Amendment violation. *See Thomas*, 463 F.3d at 296 (stating that First Amendment retaliation requires "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003))). However, being threatened with arrest, as Plaintiff Seven Wronko claims he was, may constitute a First Amendment Violation. *Id.* For this reason, summary judgment cannot be granted for Defendants Baltazar and Gannon, who allegedly threatened arrest.

D.      *Liability for Policymaking Under* Monell

The Court must now determine whether the possibly unconstitutional acts of individuals can be attributed to a policy established by other Defendants. The record contains evidence that Defendant Martin sent her subordinates an email in which she complained about Plaintiff Steven Wronko's recording and asked what could be done about it. (Pls.' SOUMF ¶ 1.) This email could support a finding that Defendant Martin established a policy that would establish *Monell* liability. Administrator Massa also sent an email stating, "Persons attempting to enter the Animal Shelter to photograph, record or film inside the shelter are to be asked to stop and Helmetta Police are to be called. The Helmetta Police will escort these individuals off the property." (*Id.* ¶

2; Pls. Ex. B.) This email could be found to constitute a policy by Defendant Borough. A reasonable jury could find that Defendant Manney engaged in unconstitutional policymaking because he forwarded to police officers an email from Administrator Massa that appeared to set a policy banning recording at the Shelter. (Pls.' SOUMF ¶ 2; Borough Defs.' Resp. to Pls.' SOUMF ¶ 6.) Factual disputes surround whether this policy was enforced and what role, if any, Defendant Manney played. (*See* Borough Defs.' SOUMF ¶¶ 61–62 (representing that Defendant Manney opposed the policy and that the policy was not enforced).) For this reason, summary judgment must be denied as to Defendants Borough, Manney and Martin.

III.    **Count III (Due Process): Summary Judgment is Granted for All Defendants Except Defendant Borough**

A police campaign to harass and intimidate individuals based on the views they express violates the Fourteenth Amendment Due Process Clause[12] as well as the First Amendment. *Thomas*, 463 F.3d at 297. As discussed above, the factual allegations in *Thomas* had significant factual differences from those alleged here, so individual defendants are entitled to qualified immunity. *See Cole v. Encapera*, 2018 WL 6822298, at *3 (3d Cir. Dec. 28, 2018) (stating that *Thomas* did not "place the constitutional question . . . beyond debate" (brackets, elipses, and internal citations omitted)). However, because qualified immunity is not available to municipal defendants, Defendant Borough may be found to have coordinated a campaign of retaliation as a matter of policy. Summary judgment is thus denied for Defendant Borough. Because no other facts have been presented that, in the light most favorable to Plaintiffs, would allow a Due Process claim to go forward, summary judgment is granted for all other Defendants on Count III.

IV.    **Count IV (NJCRA): Summary Judgment is Granted for All Defendants**

NJCRA is the state analogue to 42 U.S.C. § 1983. *Perez v. Zagami, LLC*, 94 A.3d 869,

---

[12] The New Jersey Constitution also guarantees due process of law. *Feaster*, 877 A.2d at 238 n.3.

875 (N.J. 2014). It provides a cause of action for rights violations, but it does not create substantive rights. *Id.* (internal citation omitted). For this reason, Count IV—which raises only violation of NJCRA without specifying a source of substantive rights—cannot stand. Summary judgment is therefore granted for all Defendants on this Count.

## V.     Count V (Failure to Train): Summary Judgment is Granted for All Defendants

Count V of the Complaint alleges failure to train, supervise, or discipline against Defendants Borough, Manney, and Martin. (Compl. ¶¶ 90–97.) The only fact cited by the parties relevant to this Count is the fact that Defendant Recine did not receive any training on constitutional law in the time he had been working for Defendant Police Department. (Pls.' SOUMF ¶ 12.)

A failure-to-train claim requires a showing either that (1) there was a pattern of similar violations in the past, or (2) the need for training was so obvious that a constitutional violation would be a highly predictable consequence of the failure to train. *Thomas*, 749 F.3d at 222–23, 225. Neither has been demonstrated on this record. As to the first, Defendant Recine's confrontation with Plaintiff Steven Wronko occurred just three days after the first cited instance of Plaintiff Steven Wronko's prohibition from videotaping (Borough Defs.' SOUMF ¶¶ 16, 29–46), which was not enough time to establish a pattern on which Defendants could have acted by training Defendant Recine. As to the second, an individual seeking to videotape in a municipal building is not such a common occurrence to render the need to train police officers on it obvious. Therefore, even taking the facts in the light most favorable to Plaintiffs, summary judgment must be granted for all Defendants on this Count.

## VI.     Count VI (Unconstitutional Policymaking): Summary Judgment is Denied

Count VI of the Complaint alleges unconstitutional policymaking against Defendants Manney and Martin. (Compl. ¶¶ 98–102.) Section II, *supra*, discussed that a *Monell* claim

against Defendant Martin could withstand summary judgment, given that she sent an email that arguably evinced a policy concerning how police officers should treat Plaintiffs and others. That Section also discussed that the *Monell* claim against Defendant Manney could not be decided on summary judgment due to factual disputes about whether and how Defendant Manney passed on the alleged policy to police officers. For these reasons, summary judgment is denied for both Defendants.

## VII. Count VII (Invasion of Privacy and False Light): Summary Judgment is Granted for Defendant Martin

The Complaint alleges the common law torts of invasion of privacy and false light against Defendant Martin, based on material published for her reelection campaign that identified Plaintiffs by name and that stated Plaintiffs had cost taxpayers money due to litigation they had brought. (Compl. ¶¶ 103–05; Def. Martin's SOUMF ¶ 20.)

Invasion of privacy is "an intentional intrusion, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *G.D. v. Kenny*, 15 A.3d 300, 319–20 (N.J. 2011) (internal citations and quotation marks omitted); *accord* Restatement (Second) of Torts § 652B (Am. Law Inst. Oct. 2018 update). To show invasion of privacy, a plaintiff must demonstrate that he had a reasonable expectation of privacy in the material. *G.D.*, 15 A.3d at 320. In this case, Defendant Martin's communications were all based on Plaintiffs' public activity, so summary judgment is granted for Defendant Martin.

False light invasion of privacy occurs when a defendant

gives publicity to a matter concerning another that places the other before the public in a false light and

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Romaine v. Kallinger*, 537 A.2d 284, 290 (N.J. 1988) (citing Restatement (Second) of Torts § 652E) (interior brackets omitted). Substantially accurate statements are not actionable. *G.D.*, 15 A.3d 300, 319 (N.J. 2011). Here, Plaintiffs have not identified any portion of Defendant Martin's statements about them that were false, so Defendant Martin is entitled to summary judgment on this claim.

## VIII.   Count VIII (Civil Conspiracy): Summary Judgment is Denied

The Complaint alleges civil conspiracy against Defendants Borough,[13] Manney, and Martin. (Compl. ¶¶ 106–08.) Civil conspiracy is

a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

*Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (citing *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993)). Inferring an agreement from circumstantial evidence is acceptable and, in many cases, may be the only way to establish a claim of conspiracy. *Morgan*, 633 A.2d at 998. In this case, the Court has already discussed that emails sent by Defendants Manney and Martin could constitute a policy to violate Plaintiffs' constitutional rights. *See supra* Sections II, VI. For similar reasons, these emails could evince a conspiracy to violate rights. Factual disputes exist as to whether the instructions and suggestions in these emails were followed by others. *Id.* Therefore, summary judgment must be denied as to Defendants Borough, Manney, and Martin on this Count.

---

[13] The Complaint originally alleged this Count against Defendant Police Department, but those claims are imputed to Defendant Borough. *See supra* Section I.

## IX. Summary Judgment is Granted for Defendants with Regard to All Legislative Activity

The Attorney for Defendant Borough drafted a proposed ordinance, which was never passed, that would have regulated photography in municipal buildings. (Def. Martin's SOUMF ¶¶ 18–19.) Absolute legislative immunity bars liability for all actions taken "in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). An executive official's introduction of an ordinance qualifies as legitimate legislative activity. *Id.* at 55. For similar reasons, an executive official asking an attorney to draft an ordinance would also fall within that sphere. *Id.* Thus, to the extent that any of Plaintiffs' claims rest on the Borough Attorney's drafting of a proposed ordinance, summary judgment must be granted for Defendants.

## X. Claims Remaining

Because of the complexity of this case, the Court finds it helpful to provide here a consolidated list of the claims that remain to be resolved after resolution of the Summary Judgment Motions:

- On Counts I (free speech) and II (free assembly and petition), Plaintiffs retain claims against Defendants Manney, Baltazar, Lockman, and Recine for preventing Plaintiff Steven Wronko from videorecording; against Defendants Baltazar and Gannon for threatening arrest; against Defendant Baltazar for arresting Plaintiff Steven Wronko; and against Defendants Borough, Manney, and Martin for *Monell* liability.

- On Count III (due process), Plaintiffs retain a claim against Defendant Borough for retaliation.

- On Count VI (unconstitutional policymaking), Plaintiffs retain claims against Defendants Manney and Martin.

- On Count VIII (civil conspiracy), Plaintiffs retain claims against Defendants Borough, Manney, and Martin.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied, Cielesz Defendants' Motion for Summary Judgment is granted, Borough Defendants' Motion for Summary Judgment is granted in part and denied in part, and Defendant Martin's Motion for Summary Judgment is granted in part and denied in part. An appropriate Order will follow.

Date:   2/21/19                                        /s/ Anne E. Thompson
                                                      ANNE E. THOMPSON, U.S.D.J.